UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICHARD FORTENBERRY,

     Plaintiff,

v.

AMY FUCIARELLI and TAMARA
KELLEY,

     Defendants.

_____/

Case No. 4:22-cv-12367
District Judge F. Kay Behm
Magistrate Judge Kimberly G. Altman

## REPORT AND RECOMMENDATION TO GRANT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 50)[1]

### I.    Introduction

This is a prisoner civil rights case under 42 U.S.C. § 1983. Plaintiff Richard Fortenberry, proceeding *pro se* and *in forma pauperis*, filed a complaint while incarcerated at Cooper Street Correctional (JCS) naming several Michigan Department of Correction (MDOC) medical providers and employees as defendants. (ECF No. 1). Under 28 U.S.C. § 636(b)(1), all pretrial matters have been referred to the undersigned. (ECF No. 16).

---

[1] Upon review of the parties' papers, the undersigned deemed this matter appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78(b); E.D. Mich. LR 7.1(f)(1).

1

Before the Court is a motion for summary judgment by the remaining defendants, nurse practitioners Amy Fuciarelli and Tamara Kelley.  (ECF No. 50). Fortenberry has filed a response (ECF No. 58) and the time for defendants to file a reply has passed.  For the reasons that follow, the undersigned RECOMMENDS that the motion be GRANTED.  If this recommendation is adopted, the case will be closed.

## II.     Background

### A.     Procedural History

Fortenberry filed his original complaint on November 5, 2022.  (ECF No. 1). On March 8, 2023, the district judge issued an order of partial summary dismissal, dismissing all but one defendant, Nurse Practitioner Amy Fuciarelli.  (ECF No. 13).  Thereafter, all pretrial matters were referred to the undersigned.  (ECF No. 16).

Following this, on June 16, 2023, Fortenberry filed an amended complaint as of right against Fuciarelli, all of the defendants named in his original complaint, and additional MDOC medical providers and employees.  (ECF No. 21).  On July 20, 2023, the undersigned recommended that defendants Patricia Lamb, Diane Miller, K. Anderson, Beth Fritz, C. Jones, Webb, Balwin, and Leslie be dismissed from the amended complaint under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A for failure to state a claim.  (ECF No. 22).  This recommendation was adopted, leaving

2

Fuciarelli, Kelley, Nurse Jodi Nakata, and Health Unit Manager Kristin Maxson as named defendants. (ECF No. 23). On October 20, 2023, Nakata and Maxson moved for summary judgment on the basis of exhaustion of administrative remedies. (ECF No. 31). The undersigned recommended granting that motion (ECF No. 40) and the district judge adopted that recommendation (ECF No. 42).

On October 7, 2024, the deadline for the filing of dispositive motions, Fuciarelli and Kelley filed the instant motion for summary judgment. (ECF No. 50). Thereafter, they filed a notice of stay due to the bankruptcy proceeding of their employer, Wellpath Inc. (ECF No. 53). A stay was entered and later extended, which eventually expired on April 30, 2025. *See February 20, 2025 text-only order*. Because the stay is now expired, the motion for summary judgment is ready for consideration.

### B.    Allegations

The allegations of the amended complaint were summarized as follows in the undersigned's March 5, 2024 Report and Recommendation:

> Fortenberry, a diabetic, alleges that he sent a kite[2] in September 2020, to JCS health care complaining of an ulcer in his toe. (ECF No. 21, PageID.101). He had been suffering from the toe injury for approximately five months prior to sending the kite, without receiving treatment. (*Id.*, PageID.102). Over a year later, in December 2021, he

---

[2] A "kite" is a form that allows inmates to communicate and get information about "just about anything," including court dates, visitors, lawyers' information, requests, complaints, or medical assistance. *See, e.g.*, *Meirs v. Ottawa Cnty.*, 821 F. App'x 445, 448 (6th Cir. 2020).

sent two kites to JCS health care regarding staff's refusal to administer his prescribed daily insulin dosage because he would not first allow staff to take a glucose reading. (*Id.*). He also sent a kite that month complaining of blurred vision, headaches, weight loss, and other problems due to not receiving insulin. (*Id.*).

In February 2022, Fortenberry continued to request his prescribed insulin dose, and also questioned why he was not receiving proper medical care for his foot. (*Id.*). In July of that year, he renewed his request for foot care, questioned why he was not being sent to a podiatrist, and requested probiotics to treat his diabetes. He was finally called in to see health care at Fuciarelli's request but was then placed in handcuffs and said to be a threat. (*Id.*). He alleges that this was done in retaliation for the grievances he had filed against health care. (*Id.*).

In August 2022, he sent kites again requesting to be seen for his toe and to see a podiatrist. (*Id.*). He also "made it clear" that he was not refusing treatment, but only seeking to follow the prescribed plan from his doctor. He "continued to ask Healthcare for proper treatment on his foot and did not get care as required by the doctor who prescribed proper care for [his] foot ulcer." (*Id.*).

In September 2022, Fortenberry finally received surgery on his foot. Afterward, Fuciarelli refused to issue him a wheelchair or any pain medications. (*Id.*, PageID.103). On September 6, 2022, Fuciarelli called Fortenberry into her office to examine his stitches. Fortenberry informed Fuciarelli that he was not to remove his bandages for 48 hours. At that time, Fuciarelli yelled at Fortenberry to leave her office, asked staff to come get him, and claimed that he was making a scene and needed to be escorted out. (*Id.*). She then retaliated against Fortenberry by writing "a fabricated misconduct [ticket] the next day, while still denying him a wheelchair and pain medication." (*Id.*).

Fortenberry alleges that he continued to have "constant stressful issues" with Fuciarelli through January 2023. (*Id.*). He also alleges that from August 2022 to January 2023, he made at least ten attempts to resolve the issue of his treatment with Maxson and Nakata but was "treated unfairly and less than human." (*Id.*).

Fortenberry alleges a "joint venture" to deny his required treatment.

(*Id.*).  He states that Kelley ordered staff not to give him his prescribed insulin dose out of retaliation "because [Fortenberry] did not want to give a glucose reading three times a day." (*Id.*).  Nakata contributed to this deprivation by refusing to give him his insulin dose. (*Id.*).  Maxson assisted Kelley in not providing his insulin, and also assisted Fuciarelli in her retaliation by "ignoring his pleas for a resolution and/or a change of medical providers." (*Id.*).

(ECF No. 40, PageID.271-273).

## III.   Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the case under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004).

"The moving party has the initial burden of proving that no genuine issue of material fact exists. . . ." *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotation marks omitted); cf. Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of fact," the court may "consider the fact undisputed for purposes of the motion"). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving

5

party to set forth specific facts showing a triable issue.' " *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The fact that Fortenberry is *pro se* does not reduce his obligations under Rule 56.  Rather, "liberal treatment of pro se pleadings does not require lenient treatment of substantive law." *Durante v. Fairlane Town Ctr.*, 201 F. App'x 338, 344 (6th Cir. 2006).  Additionally, "once a case has progressed to the summary judgment stage, as is true here, the liberal pleading standards under the Federal Rules are inapplicable." *J.H. v. Williamson Cnty.*, 951 F.3d 709, 722 (6th Cir. 2020) (quoting *Tucker v. Union of Needletrades, Indus., & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005)) (cleaned up).

## IV.    Discussion

Defendants argue that Fortenberry (1) failed to exhaust his administrative remedies against them before filing suit, and (2) has not shown a genuine issue of material fact regarding their deliberate indifference to his serious medical needs under the Eighth Amendment.  As will be explained, Fortenberry has only exhausted one claim against defendants, and on that claim, he has failed to show that there exists a genuine issue of material fact such that his claim should proceed to trial.

### A.    Exhaustion of Administrative Remedies

1.    Standard

The Prison Litigation Reform Act (PLRA) requires prisoners to "properly"

exhaust all "available" administrative remedies before filing a lawsuit challenging

prison conditions.  42 U.S.C. § 1997e(a); *Woodford v. Ngo*, 548 U.S. 81, 88-90, 93

(2006).  Proper exhaustion of administrative remedies "means using all steps that

the agency holds out, and doing so *properly* (so that the agency addresses the

issues on the merits)."  *Woodford*, 548 U.S. at 90 (emphasis in original) (internal

quotation marks and citations omitted).  Requiring exhaustion allows prison

officials an opportunity to resolve disputes concerning the exercise of their

responsibilities before being haled into court and produces a useful administrative

record.  *Jones v. Bock*, 549 U.S. 199, 204 (2007).  The PLRA does not detail what

"proper exhaustion" entails because "it is the prison's requirements, and not the

PLRA, that define the boundaries of proper exhaustion."  *Id.* at 218.

"Failure to exhaust administrative remedies is an affirmative defense, which

the defendant has the burden to plead and prove by a preponderance of the

evidence."  *Lee v. Willey*, 789 F.3d 673, 677 (6th Cir. 2015).  But a prisoner

countering a motion alleging failure to exhaust "must offer competent and specific

evidence showing that he indeed exhausted his remedies, or was otherwise excused

from doing so."  *Sango v. Johnson*, No. 13-12808, 2014 WL 8186701, at *5 (E.D.

Mich. Oct. 29, 2014), *report and recommendation adopted*, 2015 WL 1245969

(E.D. Mich. Mar. 18, 2015).  Granting summary judgment because of a failure to exhaust administrative remedies is not on the merits and thus requires dismissal without prejudice.  *Adams v. Smith*, 166 F. App'x 201, 204 (6th Cir. 2006).

The MDOC has established a three-step process to review and resolve prisoner grievances.  "Under the [Michigan] Department of Corrections' procedural rules, inmates must include the '[d]ates, times, places and names of all those involved in the issue being grieved' in their initial grievance."  *Reed-Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010).  As noted by the Court in *Woodford*, one of the purposes of requiring proper exhaustion is to "provide[ ] prisons with a fair opportunity to correct their own errors."  *Woodford*, 548 U.S. at 94.  To be sufficient, a grievance need not "allege a specific legal theory or facts that correspond to all the required elements of a particular legal theory."  *Burton v. Jones*, 321 F.3d 569, 575 (6th Cir. 2003) *abrogated with respect to other principles by Jones v. Bock*, 549 U.S. 199 (2007).  Nonetheless, the grievance must give "fair notice of the alleged mistreatment or misconduct that forms the basis of the constitutional or statutory claim made against a defendant in a prisoner's complaint."  *Id.*  "The grievance process is exhausted once the final response is issued in Step III."  *Parker v. Turner*, No. 20-12794, 2022 WL 1787037, at *2 (E.D. Mich. June 1, 2022).

2.    Application

8

Defendants have attached Fortenberry's Step III Grievance Report to their motion, which shows four grievances processed at JCS through Step III that may be relevant to Fortenberry's claims. (ECF No. 50-5). Defendants argue that none of the grievances exhausted any of Fortenberry's claims against them.

Fortenberry did not address the exhaustion argument in his response, but "[e]ven when faced with an unopposed motion for summary judgment, the district court cannot grant a motion for summary judgment without first considering supporting evidence and determining whether the movant has met its burden." *Byrne v. CSX Transp., Inc.*, 541 F. App'x 672, 675 (2013). That said, when a motion for summary judgment is unopposed, "[n]othing in either the Rules or case law supports an argument that the trial court must conduct its own probing investigation of the record." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 405 (6th Cir. 1992). "The court may rely on the moving party's unrebutted recitation of the evidence in reaching a conclusion that facts are uncontroverted and that there is no genuine issue of material fact." *Jones v. Kimberly-Clark Corp.*, 238 F.3d 421 (6th Cir. 2000) (table).

a.    JCS-22-0127-12z (Grievance 0127)

In Grievance 0127, Fortenberry complains that on January 3, 2022, he was given the wrong dosage of insulin by an unnamed nurse, which caused him to begin to feel ill while in the chow hall. (ECF No. 50-5, PageID.748). The Step I

9

response states that his blood sugar fell too low because his meal was delayed by a dressing change after he received his insulin and that he was treated and released from healthcare after the incident. (*Id.*, PageID.749). Fortenberry was unsatisfied with this response because "the nurse that administered [the] shot did not take into consideration what would happen in the event that [he] had went into a health care emergency," and he complained that healthcare staff refused to give him the name of the nurse that administered his shot. (*Id.*, PageID.746). The grievance was denied again at Step II for the same reasons as before, and in Fortenberry's Step III appeal he identified the nurse that administered his insulin as "Cunningham." (*Id.*). The grievance was denied again at Step III. (*Id.*, PageID.745).

The undersigned agrees with defendants that this grievance does not exhaust any claims against Fuciarelli or Kelley because Fortenberry's allegations in the complaint stem from being required to get a glucose reading before being given insulin, not an improper insulin dose on January 3, 2022, which was the subject of the grievance. Further, it appears that the alleged culprit in this grievance is a nurse named Cunningham, who is not a named defendant.

        b.    JCS-22-02-0171-28e (Grievance 0171)

In Grievance 0171, Fortenberry said that for the past few months he had been waiting for proper foot treatments as recommended by his podiatrist. (*Id.*, PageID.744). He listed the date of incident as January 4, 2022, and filed the

10

grievance on February 3, 2022.  (*Id.*).  The grievance was rejected as untimely at Step I, denied on the merits at Step II, and at Step III the prior rejection for untimeliness was upheld.  (*Id.*, PageID.741-743).  Defendants say that Grievance 0171 did not exhaust any of Fortenberry's claims against them because Fortenberry does not allege that Kelley specifically failed to treat his foot.  The undersigned agrees.  Although Fortenberry did allege inadequate care for his foot in the amended complaint beginning in February 2022, *see* ECF No. 21, PageID.102, he did not name Kelley or Fuciarelli as responsible for this in either the amended complaint or the grievance.  The events complained of pre-dated Fuciarelli's alleged involvement in Fortenberry's care, and as to Kelley, his claim against her is that she "ordered staff not to give [Fortenberry] his prescribed dosage of insulin against his Constitutional rights . . . in retaliation because [Fortenberry] did not want to give a glucose reading three times a day."  (ECF No. 21, PageID.103).  Therefore, Grievance 0171 does not exhaust any of Fortenberry's claims against Fuciarelli or Kelley.

c.     JCS-22-04-0401-12z (Grievance 0401)

On April 12, 2022, Fortenberry grieved that he was being denied insulin under Kelley's direction unless he submitted to a blood glucose reading each time.  (ECF No. 50-5, PageID.739).  This grievance was rejected at Steps I and II because according to Fortenberry's medical detail, beginning December 21, 2021,

health care was directed to check his blood glucose before administering insulin for Fortenberry's safety. (*Id.*, PageID.738, 740). The Step II denial noted that Fortenberry had been compliant with this direction beginning on July 12, 2022. (*Id.*, PageID.738). At Step III, Grievance 0401 was rejected based on the untimely filing of Fortenberry's Step III appeal. (*Id.*, PageID.736).

Defendants do not argue that the rejection at Step III is why Fortenberry's claim is unexhausted, but rather say that Fortenberry's claims against them are not related to his insulin dosage on or around April 5, 2022. They correctly note that Fortenberry's allegations against Kelley regarding the insulin and blood glucose readings occurred in December 2021 and argue that an April 2022 grievance cannot exhaust claims from four months prior. The undersigned agrees, but for the sake of completeness and because the insulin doses are at the heart of Fortenberry's claim against Kelley, this claim will also be considered on its merits later in this Report.

> d.     JCS-22-09-0815-28c (Grievance 0815)

In Grievance 0815, filed on September 12, 2022, Fortenberry complained that he brought to Fuciarelli's attention several times that he was suffering severe pain in his foot post-surgery. (*Id.*, PageID.734). He said her failure to help him was in retaliation for his refusal to sign off on prior grievance resolutions, and that Fuciarelli harassed him and became very hostile to him in denying him care,

amounting to deliberate indifference to his serious medical needs.  (*Id.*).  In an attempt to resolve the issue, Fortenberry made requests to Fuciarelli on September 5, 6, and 9 for an increase in pain medication and a wheelchair detail, to no avail. (*Id.*).

At Step I, Grievance 0815 was rejected for containing "multiple issues." (*Id.*, PageID.735).  The denial said that Fortenberry "must limit [his] grievance to one (1) issue per grievance" under MDOC PD 03.02.130.  (*Id.*).  This result was upheld by the warden at Step II and by the Grievance Manager at Step III.  (*Id.*, PageID.731, 733).

Defendants stand by this rejection, arguing that "Grievance 0815 was properly rejected and does not exhaust [Fortenberry's] claims" against Fuciarelli. (ECF No. 50, PageID.370).  However, under the effective Policy Directive at the time of the grievance, MDOC PD 03.02.130 ¶J (1) states that a grievance shall be rejected if it is "vague, illegible, or contains multiple *unrelated* issues."  (ECF No. 50-6, PageID.751 (emphasis added)).  The undersigned has noted on numerous occasions, most recently in *Alger v. Campbell*, that "grievances that contain 'multiple issues' that relate to 'one claim' and not 'multiple *unrelated* issues' should not be rejected for that reason."  No. 2:24-CV-11831, 2025 WL 1372982, at *5 (E.D. Mich. Apr. 24, 2025), *report and recommendation adopted*, 2025 WL 1372823 (E.D. Mich. May 12, 2025) (quoting *Williams v. Jamsen*, No. 2:21-CV-

13

11631, 2022 WL 18635641, at 15* (E.D. Mich. Dec. 21, 2022)).  In fact, this exact

argument has already been rejected in this very case by the Report and

Recommendation on Maxson and Nakata's motion for summary judgment.  *See*

ECF No. 40, PageID.282.

Like Maxson and Nakata, Fuciarelli and Kelley do not address whether the

"multiple issues" grieved in Grievance 0815 are related or unrelated.  Fortenberry

complained that he required increased medication and a wheelchair, both due to

foot pain, and that Fuciarelli's denial of this care was in retaliation for

Fortenberry's conduct regarding prior grievances.  A reasonable jury could find

that these issues are in fact related to one another and not in violation of MDOC

PD 03.02.130 ¶J (1).  Therefore, the undersigned finds that Fortenberry's claim

against Fuciarelli on these issues, from September 2022 to January 2023 as stated

in the amended complaint, has been exhausted.

> e.     JCS-22-10-0886-12Z (Grievance 0886)

Lastly, Fortenberry filed Grievance 0886 on October 18, 2022, alleging that

he was being harassed by healthcare with unnecessary call outs for wound care and

medical supplies.  (ECF No. 50-5, PageID.728-730).  This grievance appears to

relate only to Maxson and Nakata, regarding claims that are not present in the

amended complaint.  Thus, defendants are correct that Grievance 0886 does not

exhaust any claims as to them.

    B.  Deliberate Indifference to Serious Medical Needs

      1.  Standard

   Under the Eighth Amendment, prisoners have a constitutional right to medical care. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Prison officials may not act with deliberate indifference to the medical needs of their prisoners. *Id.* at 104. An Eighth Amendment claim has two components, one objective and the other subjective. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2002).

   Under the objective component, "the plaintiff must allege that the medical need at issue is 'sufficiently serious.' " *Comstock*, 273 F.3d at 702-03 (quoting *Farmer*, 511 U.S. at 834). In *Farmer*, the Court held that the objective test requires that "the inmate show that he is incarcerated under conditions posing a substantial risk of serious harm." 511 U.S. at 834; *see also Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004). Under the subjective component, "the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock*, 273 F.3d at 703.

      2.  Application

On the merits, the undersigned will address Fortenberry's exhausted claim against Fuciarelli for denial of care for his foot pain from September 2022 to January 2023, and his claim against Kelley for requiring blood glucose checks before providing him his insulin in or around December 2021.  Defendants argue that Fortenberry cannot satisfy the objective or subjective components of a deliberate indifference claim as to either of them and have submitted medical records and declarations from Fuciarelli and Kelley in support.  (ECF No. 50).  Fortenberry responds with kites and medical records of his own and says that defendants should be held liable because their medical decisions were a substantial departure from accepted professional judgment.  (ECF No. 58).

### a.  Fuciarelli

### i.  Medical Record

Based on the medical records before the Court, Fuciarelli's involvement with Fortenberry's care began on June 16, 2022.  (ECF No. 50-1, PageID.522).  On that date, she noted that his left great toe had marked improvement and found that the osteomyelitis of that toe had resolved.  (*Id.*, PageID.522, 526).  She changed his dressing and prescribed dressing changes every week for the following two weeks.  (*Id.*).  On June 21, Fuciarelli referred Fortenberry for a podiatry follow up, recommending that he continue to wear an "immobilizer off-leading boot" for two weeks and follow up for a diabetic orthotic shoe.  (*Id.*, PageID.529).  She saw him

again on June 29, where she noted a small sore on his foot, changed his dressing, and instructed him to continue wearing his boot until this orthotic shoe was ordered.  (*Id.*, PageID.535).  She also noted that they had a lengthy discussion regarding compliance with podiatry recommendations and that Fortenberry needed some reinforcement with compliance.  (*Id.*, PageID.538).  Fortenberry's new sore was reportedly due to non-compliance with wearing his off-loading boot.  (*Id.*).

On July 10, 2022, Fortenberry filed a kite complaining that Fuciarelli initially gave him ointment to apply to his foot, but then "back tracked" on that agreement after another nurse had a problem with it.  (*Id.*, PageID.553).  Fortenberry said he was "lied on and abused [be]cause of Frucarelli's (sic) false accusations to C/O staff."  (*Id.*).  Fuciarelli saw Fortenberry on July 14, and Fortenberry reported that he had been applying a dry dressing to his foot daily and wearing the off-loading boot.  (*Id.*, PageID.554).  He denied pain, odor, redness, heat, bloody drainage, and foot numbness or tingling.  (*Id.*).  Fortenberry also sent a kite to complain that he did not want Fuciarelli to be his provider because "[i]f she is willing to lie on me then there is no telling if she'll sabotage my medical issues."  (*Id.*, PageID.561).  He also requested to not be treated by two other nurses, but his requests were denied.  (*Id.*).  Fuciarelli and other staff continued to treat Fortenberry through July and August of 2022.  (*Id.*, PageID.562-590).

On August 18, 2022, Fuciarelli filed an administrative note stating that

17

Fortenberry was "difficult to care for in the clinic from the standpoint of [her]self and the nurses." (*Id.*, PageID.591).  She noted that he suffered from osteomyelitis and had a diabetic ulcer for six weeks prior to her employment at the facility and that he was at risk of amputation but refused.  (*Id.*).  He was non-compliant with his off-loading boot and had refused to come to the clinic for nursing staff to apply an ointment that required refrigeration, which was prescribed by podiatry.  (*Id.*).  This caused his ulcer to re-open.  (*Id.*).  He also refused to let nurses see the new ulcer and did his own dressing changes.  (*Id.*).

On September 1, 2022, Fortenberry sent a kite stating that he had an agreement with Fuciarelli and requesting to not be called out for any provider other than her to assess his foot.  (*Id.*, PageID.602).  He said he is "NOT refusing treatment just who does it."  (*Id.*).  The response indicated that Fuciarelli was the provider who wrote the order for nursing to check Fortenberry's foot.  (*Id.*).  An administrative note was also entered by a different provider that day stating that Fortenberry refused to allow nursing staff to assess his toe wound.  (*Id.*, PageID.601).  Fuciarelli entered an administrative note that day as well, noting Fortenberry's refusal to be treated by others and stating that she "is not comfortable being in examination room [with Fortenberry] without chaperone." (*Id.*, PageID.603).  She requested that a corrections officer be present during clinic visits.  (*Id.*).

18

On September 6, Fortenberry returned to his facility after a debridement procedure on his toe, and Fuciarelli reviewed the discharge instructions, ordered ice, an extra pillow, and walker with seat for assistance with ambulation, and requested a follow up visit with podiatry. (*Id.*, PageID.614). Fuciarelli treated him again the next day due to pain, but Fortenberry would not let her remove his dressing to assess his toe. (*Id.*, PageID.617). The visit ended when Fortenberry became argumentative and "attempted to dictate pain control treatment plan." (*Id.*, PageID.618).

Fuciarelli continued to provide care to Fortenberry throughout September and October 2022. (*Id.*, PageID.619-645). On October 20, he kited to ask not to be called out for foot treatments, as he only needed Dr. Page (his podiatrist) to debride his wound. (*Id.*, PageID.646). On October 24, Fortenberry was approved for orthotic shoes and insoles. (*Id.*, PageID.647). Fortenberry was seen on November 15 for fitting and dispensing of his orthotic shoe. (*Id.*, PageID.661). On December 9, Fortenberry was seen again by Dr. Page for his "chronic nonhealing ulceration." (*Id.*, PageID.665). Fortenberry reported that the wound continued to get smaller with less drainage and no pain. (*Id.*). A successful debridement was done by Dr. Page, who recommended that Fortenberry continue taking bacitracin and applying a light bandage two to three times daily, continue offloading with surgical shoe, and monitor for symptoms of infection. (*Id.*).

19

On December 14, 2022, Fortenberry refused to see Fuciarelli with a corrections officer present.  (*Id.*, PageID.668).  Fortenberry reportedly "abruptly" left the office with the corrections officer, but then requested to be seen, and his request was denied.  (*Id.*, PageID.670).  He sent a kite that day requesting to be seen by someone else because he did not want an officer present as Fuciarelli required.  (*Id.*, PageID.671).  His request was denied.  (*Id.*).  Fortenberry refused a wound check again on December 29.

In January 2023, Fortenberry sent two kites complaining that he was required to see Fuciarelli but could not see her without an officer present, which he objected to for confidentiality reasons.  (*Id.*, PageID.679-680).  Both times, Nakata responded informing Fortenberry that Fuciarelli had a right to have custody in the room if she wanted.  (*Id.*).  Fuciarelli also stated in a January 17 administrative note that Fortenberry refused to see her for an appointment that day.  (*Id.*, PageID.681).

ii.    Analysis

Defendants correctly maintain that based on the record above, Fortenberry cannot meet the objective or subjective components of a deliberate indifference claim against Fuciarelli.  In order to satisfy the objective component of the deliberate indifference test, Fortenberry would need to show that he had a medical need diagnosed by a physician as mandating treatment and that a prison official

20

failed to treat the condition, or that treatment was "so cursory as to amount to no treatment at all." *Dominguez v. Correctional Med. Servs.*, 555 F.3d 543, 551 (6th Cir. 2009) (internal citation omitted).  Alternatively, if Fortenberry received ongoing treatment for his condition but claims the treatment was inadequate, then his claim requires a showing of care "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *See Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

In *Phillips v. Tangilag*, 14 F.4th 524, 536 (6th Cir. 2021), the Sixth Circuit reiterated that where an inmate has a serious medical need that he is treated for, he "cannot rely on his serious medical needs alone to establish the objective element of his deliberate-indifference claim."  "Rather, because he challenges the adequacy of this undisputed care, he must show that the doctors provided grossly incompetent treatment."  *Id.*

Defendants argue that under *Tangilag*, Fortenberry's claim must fail because he did not put in the record "expert medical evidence describing what a competent doctor would have done and why the chosen course was not just incompetent but grossly so."  (ECF No. 50, PageID.359).  The Sixth Circuit has laid out an exception to this rule, stating that "in cases where the medical need is so obvious that even a layperson would easily recognize the necessity for a doctor's attention,

21

the plaintiff need not present verifying medical evidence to show that, even after receiving the delayed necessary treatment, his medical condition worsened or deteriorated." *Burwell v. City of Lansing, Michigan*, 7 F.4th 456, 463 (6th Cir. 2021) (internal citations omitted).  However, that is not the case here.  The medical record shows no delay in care, nor does it show an obvious deterioration of Fortenberry's medical condition due to any such delay.

Based on the record before the Court, Fortenberry cannot show that his treatment by Fuciarelli amounted to deliberate indifference.  Rather, Fortenberry is the one who refused on numerous occasions to have his toe assessed, chose to undergo continual debridement and treatment rather than amputation, and refused to be seen first by providers other than Fuciarelli, then by Fuciarelli herself in the presence of a corrections officer.  The record reflects that Fuciarelli's insistence on a corrections officer's presence is reasonable, as Fortenberry commonly became argumentative and difficult to deal with.  As Fuciarelli stated in her declaration, Fortenberry was noncompliant with treatments and she feared for her safety if she was not accompanied by an officer during Fortenberry's visits.  (ECF No. 50-3, PageID.699-701).

Similarly, Fortenberry's claim fails to meet the subjective component of a deliberate indifference claim because his complaints amount to no more than a disagreement over his medical treatment.  Such complaints "implicate medical

22

judgments and not the Eighth Amendment." *Hale v. Corr. Med. Servs., Inc.*, No. 1:10-CV-1008, 2012 WL 4382361, at *9 (W.D. Mich. Aug. 21, 2012); *report and recommendation adopted*, 2012 WL 4381917 (W.D. Mich. Sept. 25, 2012). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Fuciarelli took account of Fortenberry's objective and subjectively relayed symptoms during his visits with her and treated him in a manner that was not grossly incompetent on its face. She cannot be said to have "subjectively perceived facts from which to infer substantial risk to [Fortenberry]," "[drawn] that inference," and then "disregarded that risk." *Comstock*, 273 F.3d at 703. Although Fortenberry may have disagreed with his treatments and prison policies regarding treatment, he has failed to allege a constitutional deprivation. Therefore, summary judgment is appropriate as to Fuciarelli on Fortenberry's deliberate indifference claim.

### b.    Kelley

### i.    Medical Record

On September 22, 2021, Fortenberry was transferred to JCS. (ECF No. 50-1, PageID.374). His transfer paperwork noted that he had refused insulin adjustment or blood glucose monitoring in June 2020, September 2020, December

23

2020, and March 2021.  (*Id.*).  These refusals continued sporadically at JCS and often overlapped with his care from Kelley in late 2021.

On September 23, 2021, the day after Fortenberry arrived at JCS, an administrative note reflects that Fortenberry refused to submit to an "accucheck" of his blood glucose levels before receiving his insulin.  (*Id.*, PageID.377).  He stated that this was the way he had always done it, but the note reflects that his previous facility also reported non-compliance with blood glucose checks.  (*Id.*).  The next day, Fortenberry was seen by Kelley for a chronic care visit.  (*Id.*, PageID.378).  Kelley reviewed with Fortenberry the necessity of having accuchecks before receiving insulin.  (*Id.*, PageID.381).

On November 14, 2021, Fortenberry allowed his glucose levels to be checked before receiving insulin.  (*Id.*, PageID.386).  His levels were high, but he refused to take additional units of insulin, stating that he would just skip eating breakfast, drink some water, and be fine.  (*Id.*).  On December 13, Fortenberry was seen again and his glucose was checked, but he stated he would no longer allow it to be checked after that.  (*Id.*, PageID.388).  He was educated on the importance of checking his glucose before receiving insulin but refused to take his own glucometer and stated again that his prior facility provided his insulin without checking his glucose first.  (*Id.*).

That day, Fortenberry sent a kite to complain that he would like to receive

24

his prescribed amount of insulin without doing a check first.  (*Id.*, PageID.389).

He was informed that the blood glucose checks were not an MDOC policy, but

"per nursing guidelines" staff "need to know what your blood sugars are due to

liability for nursing staff."  (*Id.*).  Fortenberry complained again the next day about

the policy and received the same response.  (*Id.*, PageID.390).

On December 15, Fortenberry was denied insulin after he refused to check

his blood glucose.  (*Id.*, PageID.391).  The following day, Fortenberry was offered

a release from responsibility form for refusal to adhere to treatments, but he

refused to sign the form.  (*Id.*, PageID.392).  That same day, he was informed by

Kelley that he likely had "hypoglycemia unawareness," and that the standard of

care indicated blood glucose readings before administering rapid acting insulin.

(*Id.*, PageID.393).  Kelley informed him of the risks of refusing to check his

glucose and that he would not receive insulin without an accucheck first.

Fortenberry refused instruction on glucose management for diabetics and, as noted

above, refused to sign the release form.  (*Id.*).

Fortenberry refused glucose readings again on December 18, 19, 20, 21, and

22.  (*Id.*, PageID.396-402, 405-406).  He kited the issue again on December 20 and

21.  (*Id.*, PageID.403-404).  On January 3, 2022, Fortenberry's blood glucose

crashed in the cafeteria and he was found by a nurse to be very pale, lethargic, and

diaphoretic.  (*Id.*, PageID.407).

Fortenberry last saw Kelley on January 11, 2022, stating that he learned about a medicine called pendulum life for diabetes.  (*Id.*, PageID.416).  Kelley informed him that the medication is "non formulary" but encouraged him to see if probiotics were available from the store.  (*Id.*).

ii.   Analysis

As above with Fortenberry's claim against Fuciarelli, to meet the objective component of a deliberate indifference claim against Kelley, he must show that his treatment was "so cursory as to amount to no treatment at all," *Dominguez*, 555 F.3d at 551, or that it was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."  *Miller*, 408 F.3d at 819.  As to the subjective component, Fortenberry must allege more than a disagreement with Kelley's medical judgment.  *Westlake*, 537 F.2d at 860 n.5.  Fortenberry's allegations fall well short of these standards.

Untreated diabetes has been found to constitute a sufficiently serious medical need in some circumstances.  *See Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005) (holding that a diabetic plaintiff who was not treated with insulin injections at regulated intervals, resulting in the plaintiff's emergency hospital admission and a stay of several days, satisfied the objective requirement for deliberate indifference).  But in *Garretson*, the plaintiff was held in the city's lock-up facility without her insulin, which she had requested and said

26

that she needed.  Here, Fortenberry would have been readily provided with insulin

at any point had he complied with the medical directive to check his glucose first,

and he was provided insulin on the occasions that he allowed glucose readings.

This was explained to him as the standard of care for diabetic inmates, according to

the medical record as well as Kelley's declaration.  (ECF No. 50-2, PageID.689).

Fortenberry has submitted no evidence that this standard of care was grossly

inadequate or amounted to no treatment at all.

In addition, as defendants correctly note, a voluntary refusal of treatment

precludes an Eighth Amendment claim.  *Palmer v. Wagner*, 3 F. App'x 329, 331

(6th Cir. 2001); *see also Johnson v. Allen*, No. 1:15-CV-1329, 2016 WL 860428, at

*4 (W.D. Mich. Mar. 7, 2016) ("Plaintiff's insistence on another course of

treatment resulted in no treatment at all.").  As the court noted in *Johnson*, this rule

is not limited to the Sixth Circuit, but recognized by many other Circuit Courts as

well.  *See, e.g., Richard v. Bokor*, 379 F. App'x 719, 720-22 (10th Cir. 2010)

(prisoner failed to state a claim for deliberate indifference where he thwarted

medical personnel's efforts by disrupting the medical visits and refusing the

offered treatment); *Day v. Lantz*, 360 F. App'x 237, 238–39 (2nd Cir. 2010)

(prison employees were not deliberately indifferent to plaintiff prisoner's serious

medical needs when they diagnosed and treated the prisoner's inguinal hernia, but

the prisoner refused to undergo surgery to repair it); *Pinkston v. Madry*, 440 F.3d

879, 892 (7th Cir. 2006) (affirming judgment in favor of medical personnel on inmate's claim of deliberate indifference, where the inmate was the sole cause of delay in treatment).

In sum, based on the record before the Court, Fortenberry has not met his summary judgment burden to make out a deliberate indifference claim against Fuciarelli or Kelley sufficient to take the case to trial.

C.      Retaliation

1.      Standard

Fortenberry alleges that defendants denied him insulin and foot treatments, including access to a wheelchair, and that Fuciarelli wrote a misconduct ticket against him, in retaliation for his grievance filing.  "[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)).  A First Amendment retaliation claim has three elements:

> (1) the plaintiff engaged in protected conduct;
>
> (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and
>
> (3) there is a causal connection between elements one and two -- that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

28

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).  With respect to

causation, "bare allegations of malice" are insufficient to state a constitutional

claim; a plaintiff must instead establish that his protected conduct motivated the

allegedly retaliatory action taken.  *Id.* at 399.

2.      Analysis

The filing of grievances is protected First Amendment conduct; therefore,

Fortenberry has met the first element of a retaliation claim.  *See Sedore v.*

*Landfair*, No. 2:22-CV-10060, 2023 WL 9511518, at *6 (E.D. Mich. Dec. 6, 2023)

(citing cases), *report and recommendation adopted*, 2024 WL 36009 (E.D. Mich.

Jan. 3, 2024).  He has however failed to show that he suffered an adverse action or

that there was a causal connection between his protected conduct and the

defendants' actions.

> The Sixth Circuit has described an adverse action as
>
> one that is "*capable* of deterring a person of ordinary firmness" from exercising the constitutional right in question.  "*Actual* deterrence need not be shown."  Even the threat of an adverse action can satisfy this element if the threat is capable of deterring a person of ordinary firmness from engaging in the protected conduct.

*Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) (internal citations omitted).

Regarding Fortenberry's treatment provided by Kelley and Fuciarelli, as reflected

by the medical record and defendants' declarations in support of their motion,

Fortenberry has not suffered actions that would deter an ordinary person from

29

filing grievances.  He has, in fact, grieved the claims that he now pursues.  But more importantly, he has been treated according to an established standard of care, and the only evidence of record indicates that any gaps in his treatment were the result of his own doing.  He did not receive insulin when he refused to provide a glucose reading; he was not compliant with recommended treatments for his foot; and he refused to be treated by the staff that was available to treat him.

Furthermore, Fortenberry cannot show that defendants' actions were caused by his exercise of protected conduct.  Regarding the blood glucose readings, Fortenberry was denied insulin unless he provided a reading immediately upon arriving at JCS.  Fortenberry does not plausibly suggest that any protected conduct before his arrival was the cause for this medical decision.  As for allegations against Fuciarelli, Fortenberry was allegedly placed in handcuffs and said to be a threat on September 6, 2022, but had not filed a grievance against Fuciarelli until September 12.  For these reasons, Fortenberry has not made out a retaliation claim against either defendant regarding their medical treatment of him sufficient to survive summary judgment.

As for Fortenberry's claim that Fuciarelli filed a retaliatory misconduct ticket against him, defendants argue that the "guilty" finding against him for the misconduct "essentially checkmates" a retaliation claim based on the misconduct. (ECF No. 50, PageID.365; ECF No. 50-4, Fortenberry's misconduct report).

Defendants cite to a string of unpublished cases invoking the so-called "checkmate doctrine," which states that a finding of guilt based on evidence of a violation of prison rules forecloses a retaliation claim.  *See Jones v. Barnett*, No. 05-73673, 2007 U.S. Dist. LEXIS 10058, at *10 (E.D. Mich., Feb. 14, 2007) (citing *Jackson v. Madery*, 158 F. App'x 656, 661 (6th Cir. 2005)); *Burton v. Rowley*, No. 00-114, 2000 U.S. App. LEXIS 28000 (6th Cir. 2000); *Brown v. Caruso*, No: 07-11804, 2008 U.S. Dist. LEXIS 15460, at *6-7 (E.D. Mich. Feb. 29, 2008); *Bloodworth v. Timmerman-Cooper*, No. 2:10-CV-1121, 2011 U.S. Dist. LEXIS 91732, at *7 (S.D. Ohio July 18, 2011) *report and recommendation adopted*, by 2011 U.S. Dist. LEXIS 91782 (S.D. Ohio Aug. 17, 2011).

However, in *Maben v. Thelen*, 887 F.3d 252, 262 (6th Cir. 2018), the Sixth Circuit stated that "[t]he 'checkmate doctrine' is contrary to and irreconcilable with the burden-shifting framework that this Court has adopted when analyzing a prisoner's retaliation claim."  "Guilt of misconduct may be relevant summary judgment evidence within that framework, but it does not automatically bar a plaintiff's claim."  *Id.*  Therefore, this claim cannot be dismissed solely because Fortenberry was found guilty of the misconduct.

That said, defendants are correct that Fortenberry has provided no evidence that the misconduct ticket—written for disobeying a direct order to leave the healthcare area—was issued for any reason other than his refusal to leave after

31

being ordered to do so several times.  (ECF No. 50-4, PageID.707-708).

Fortenberry must meet his burden of "establishing that his protected conduct was a

motivating factor behind any harm" before "the burden of production shifts to the

defendant." *Thaddeus-X*, 175 F.3d at 399 (citing *Mount Healthy City Sch. Dist.*

*Bd. of Educ. v. Doyle,* 429 U.S. 274 (1977)).  Fortenberry's implied argument, that

he was issued the ticket not for disobeying direct orders but for having filed

grievances against Fuciarelli, is tenuous at best.  Fortenberry does not address

defendants' argument in his response or offer any evidence to meet his summary

judgment burden.  The undersigned therefore recommends that summary judgment

be granted on Fortenberry's retaliation claims.

## V.   Conclusion

For the reasons stated above, the undersigned RECOMMENDS that

Fuciarelli and Kelley's motion for summary judgment (ECF No. 50) be

GRANTED.  If this recommendation is adopted, the case will be closed.

Dated: June 23, 2025                         s/Kimberly G. Altman
Detroit, Michigan                            KIMBERLY G. ALTMAN
                                             United States Magistrate Judge


## **NOTICE TO PARTIES REGARDING OBJECTIONS**

The parties to this action may object to and seek review of this Report and

Recommendation.  Any objections must be filed within 14 days of service, as

32

provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).

Failure to file specific objections constitutes a waiver of any further right of

appeal. *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health &*

*Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991).  Filing objections that raise some

issues but fail to raise others with specificity will not preserve all the objections a

party might have to this Report and Recommendation. *Willis v. Sec'y of Health &*

*Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Under Local Rule

72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2,"

etc.  Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains.  Not later than 14 days after service of an

objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR

72.1(d).  The response must specifically address each issue raised in the objections,

in the same order, and labeled as "Response to Objection No. 1," "Response to

Objection No. 2," etc.  If the court determines that any objections are without

merit, it may rule without awaiting the response.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon
counsel of record and any unrepresented parties via the Court's ECF System to

their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 23, 2025.

<u>s/Dru Jennings</u>
DRU JENNINGS
Case Manager